UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| LUCY SCHNABEL, ET AL., | : | CIVIL ACTION NO. |
|     Plaintiffs, | : | 3:10-CV-957 (JCH) |
| | : | |
|     v. | : | |
| | : | |
| TRILEGIANT CORP. and AFFINION, INC., | : | FEBRUARY 24, 2011 |
| | : | |
|     Defendants. | : | |

**RULING RE: MOTION TO DISMISS OR STAY AND COMPEL ARBITRATION**
**(Doc. No. 23)**

**I.    INTRODUCTION**

Plaintiffs, Lucy Schnabel ("Lucy"), Brian Schnabel ("Brian"), and Edward Schnabel ("Edward"), bring this action against defendants, Trilegiant Corp. ("Trilegiant") and Affinion, Inc. ("Affinion"), on behalf of themselves and a class of similarly situated individuals alleging, inter alia, that defendants fraudulently induced a class of plaintiffs into paying for an online discount program. See generally Compl. (Doc. No. 1). Defendants filed the present Motion to Dismiss or Stay and Compel Arbitration (Doc. No. 23), in light of an arbitration clause they allege that plaintiffs agreed to abide by. At the parties' request, the court issued a stay of discovery pending the resolution of this Motion. See Doc. No. 18.

For the following reasons, the court denies defendants' Motion and removes the stay on discovery.

**II.    FACTUAL BACKGROUND**

On August 3, 2009, Edward signed on to Beckett.com to purchase baseball memorabilia. Mallozzi Aff. ¶ 6, Sept. 29, 2010 (Doc. No. 23-1); Edward Schnabel Decl.

1

¶ 3-4, Oct. 18, 2010 ("Edward Decl.") (Doc. No. 24-1). At the conclusion of that transaction, he was prompted to sign up for "Great Fun," an online discount program operated by Trilegiant. Mallozzi Aff. ¶ 6; Edward Decl. ¶ 4. At a glance, the prompt appears to be for a cash-back award directly from Beckett.com. See Defs.' Mem., Ex. A. In order to receive this award, however, Edward was prompted to enter a password and his city of birth and simultaneously enroll in the Great Fun program. Id. In smaller print, at the bottom of this prompt, Edward was informed that, by signing up for the program, he would be billed $14.99 monthly. Id. After clicking "Yes," Edward was shown another screen containing the following information:

> Thanks for trying Great Fun!
>
> Watch for your welcome email, arriving soon. Also, in approximately two business days (excluding holidays) you'll receive an email with instructions on how to get your gift. If we can't send the email, we'll automatically mail you the details.
>
> The terms of your payment authorization for Great Fun follow. Please print or save a copy of this authorization for your records: Try the service with the first month, Free. The $14.99 membership fee, or then-current monthly fee, will be billed automatically each month to the credit or debit card entered for Beckett unless you call toll free during your one-month trial to cancel. You can call at any time to cancel your benefits and you will not be billed for any additional months. The Free Gift is yours to keep, no matter what!
>
> You'll soon see that life's more fun when it costs less . . .

Id. These statements were followed by a link to "Go to Great Fun!" Id.

Edward claims to have not realized that he signed up for Great Fun, but believed he was still responding to Beckett.com. Edward Decl. ¶ 4. He admits to having entered his city of birth, but denies having seen the final confirmation page described above. Id. Edward also claims to have never entered any additional information, such as a

2

password.  Id.

Nonetheless, Edward began to receive monthly charges to his credit card in the amount of $14.99.  Mallozzi Aff. ¶ 8; Edward Decl. at ¶ 3.  These charges were made six times before Edward's wife, Lucy, called to cancel the account.  Mallozzi Aff. ¶ 9; Edwards Decl. ¶ 3.  Trilegiant refunded four of the six months.[1]  Mallozzi Aff. ¶ 9.

On August 4, 2009, the day after Edward's purchase on Beckett.com, Edward received an email from "Great Fun Customer Service."  Pl.'s Opp., Ex. A. (Doc. No. 24-1).  The email's subject is "Welcome to Great Fun!," and it opens with a message explaining Edward's membership, including access information and Edward's account number and username.  Id.  There is also the image of a membership card.  Id.  No mention is made of terms and conditions in the opening welcome message, but at the bottom of the email, in smaller font, is a section describing itself as "Great Fun Membership Terms & Conditions."  Id.  These terms and conditions purport to describe an agreement made between Trilegiant and "the person specified in the [Great Fun] membership card."  Id.  Within these terms and conditions is an arbitration clause.  Id.  Edward claims to have not been aware of this email until the present litigation.  Edward Decl. ¶ 7.

Brian's experience was quite similar to that of Edward.  On November 7, 2007, Brian appears to have made a purchase on Priceline.com.  Mallozzi Aff. ¶ 10; Brian Schnabel Decl. ¶ 7, Oct. 18, 2010 ("Brian Decl.") (Doc. No. 24-2).  A pop-up

---

[1] Lucy's claims in this case appear to be based on her status as a co-signer with Edward on the credit card that was charged by Trilegiant.  See Lucy Schnabel Decl. ¶ 3, June 8, 2010 (Doc. No. 1); Edward Decl. ¶ 3.

3

advertisement suggested that Brian could save up to twenty percent of his purchase price. Brian Decl. ¶ 9; Defs.' Mem., Ex. C. Brian does not recall entering any information other than his email address, but Trilegiant appears to have received a password, as well as Brian's city of birth. Mallozzi Aff. ¶¶ 10-11; Brian Decl. ¶¶ 9-10; Defs.' Mem., Exs. C-D. Trilegiant charged Brian $11.99 per month for a total of thirty months before he called to cancel his account. Mallozzi Aff. ¶ 12; Brian Decl. ¶¶ 4-5. Trilegiant refunded four of the thirty months of payments. Mallozzi Aff. ¶ 12; Brian Decl. ¶ 5.

Trilegiant claims to have sent an email to Brian that was similar to that received by Edward, including the same terms and conditions. Mallozzi Aff. ¶¶ 13-14. Brian claims, however, that he did not receive this email. Brian Decl. ¶ 14.

## III. ANALYSIS

### A. Standard of Review and Applicable Law

The Federal Arbitration Act ("FAA") requires the enforcement of an arbitration agreement between parties in interstate commerce. See 9 U.S.C. § 2; Fensterstock v. Educ. Fin. Partners, 611 F.3d 124, 132 (2d Cir. 2010). "Congress' purpose in enacting the FAA 'was to reverse the longstanding judicial hostility to arbitration agreements . . . and to place arbitration agreements upon the same footing as other contracts.'" Fensterstock, 611 F.3d at 132 (quoting Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 24 (1991)) (alteration in original). It is the court's duty to interpret and construe an arbitration agreement, but only where one is "validly formed" and "legally enforceable." Granite Rock Co. v. Int'l Bhd. of Teamsters, 130 S. Ct. 2847, 2859-60 (2010). As with all contracts, "[a]rbitration is strictly a 'matter of consent'" id. at 2857

4

(quoting Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ., 489 U.S. 468, 479 (1989)), and "'a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" Specht v. Netscape Commc'n Corp., 306 F.3d 17, 26 (2d Cir. 2002) (quoting AT&T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 648 (1986)).

Contract formation is first a question of state law. See id. at 27. Which state's law should apply, however, is not entirely clear. The disputed terms and conditions include a Connecticut choice of law provision. See Pls.' Opp., Ex. A. It would require some amount of recursive reasoning, however, to apply the choice of law clause of a contract that a court later determines does not exist. Defendants nonetheless rely on Connecticut law in making their arguments. See Defs.' Mem. 9. Plaintiffs object and seek the application of California law, their place of residence. Pls.' Opp. 13 & n.10. The court need not resolve this dispute because, regardless of the law applied, the result is the same.[2]

If there remain issues of fact material to determining whether a contract exists, a court must hold a trial for the express purpose of resolving those facts. See 9 U.S.C. § 4 ("If the making of the arbitration agreement . . . be in issue, the court shall proceed

---

[2] The Connecticut Supreme Court follows the Restatement (Second) of Conflicts of Law, which generally applies the law of the state "chosen by the parties." See Reichhold Chems., Inc. v. Hartford Accident & Indem. Co., 252 Conn. 774, 788 (2000); Restatement (Second) of Conflicts of Law § 187. However, this court does not find that a contract exists between the parties that included a choice of law provision. See discussion, infra, at 6-12. Therefore, it would seem that the better approach would be to apply the law of the state with the most significant relationship to the contract claims. See Am. States Ins. Co. v. Allstate Ins. Co., 282 Conn. 454, 461 (2007) (citing Restatement (Second) of Conflicts of Law § 188). The Restatement focuses on a list of factors including, inter alia, the place of contracting and the domicile of the parties. See Restatement (Second) of Conflicts of Law § 188(2). In light of the fact that this case involves internet transactions between parties in different states—Trilegiant in Connecticut and the Schnabels in California—the decision of which law to apply would likely be somewhat difficult to make.

5

summarily to the trial thereof."). However, no trial is necessary "where the court can rule upon the existence of the arbitration agreement 'as a matter of law on the record before it.'" Adams v. Suozzi, 433 F.3d 220, 228 (2d Cir. 2010) (quoting Specht, 306 F.3d at 28). For the reasons articulated more fully below, no material issues of fact exist such that a reasonable jury could find that an agreement to arbitrate has been made between the parties. Therefore, no trial is necessary, defendants' Motion is denied, and parties are instructed to proceed with discovery.

B. Is There an Agreement to Arbitrate?

"The rules governing contract formation are well settled." Auto Glass Express, Inc. v. Hanover Ins. Co., 293 Conn. 218, 227 (2007). The extension of "an offer imposes no obligation upon either party, until it is accepted by the offeree, according to the terms in which the offer was made." Id.; see also Donovan v. RRL Corp., 26 Cal. 4th 261, 270-71 (2001) ("An essential element of any contract is the consent of the parties, or mutual assent. Mutual assent usually is manifested by an offer communicated to the offeree and an acceptance communicated to the offeror." (internal citations omitted)). It is a fundamental principle of contract law that there "be an unequivocal acceptance of an offer." Bridgeport Pipe Eng'g Co. v. The DeMatteo Constr. Co., 159 Conn. 242, 246 (1970); see also Smith v. Westland Life Ins. Co., 15 Cal. 3d 111, 116 n.7 (1975) ("[T]he common law rule of contract law . . . requires an acceptance to be absolute and unqualified."). As noted by the late Judge Fred I. Parker: "In recent years, the proliferation of mass market standardized contracts . . . has forced courts to pay particular attention the issue of assent." Register.com, Inc. v.

Verio, Inc., 356 F.3d 393, 428 (2d Cir. 2004) (Parker, J., draft opinion).[3]

Defendants argue that Edward and Brian accepted Trilegiant's proposed terms and conditions (including its arbitration clause) by (1) enrolling in the Great Fun program online, (2) paying their monthly fees, and (3) receiving emailed terms and conditions.[4] However, even if the court were to assume that each of the above occurred, the court cannot find the makings of an agreement to arbitrate.

Taking the facts as defendants allege them, Edward and Brian agreed to a monthly charge to their credit cards, after responding to a number of prompts online. This charge was in exchange for an online discount program. In support of their Motion, defendants attached a number of images captured from online purchases like the ones completed by Edward and Brian. See Defs.' Mem., Exs. A, C. According to defendants, these screen shots were substantially similar to the ones observed by the Schnabels. Mallozzi Aff. ¶¶ 6, 10. However, none of these screen shots include the terms and conditions defendants claim plaintiffs are now bound by, nor do they make any mention of arbitration. In fact, the concluding screen—entitled "Thanks for trying Great Fun!"—includes a paragraph that describes itself as, "The terms of your payment." Defs.' Mem., Ex. A. Nowhere in this paragraph does Trilegiant mention

---

[3] Judge Parker's opinion was drafted before the final decision was made in the Register.com case, and it did not command the majority of the court. See Register.com, 356 F.3d at 395 n.1 (majority opinion). Judge Parker died before the final decisions were completed, and the Second Circuit opted to publish his draft opinion in lieu of a dissent. Id.

[4] Defendants' Memoranda also states that Edward and Brian received mailed copies of the terms and conditions. See Defs.' Mem. 11. However, the attached Affidavit by Trilegiant's Director of Customer Relations does not support this statement. While Mallozzi states that it is Trilegiant's routine practice to mail this information, she does not claim that this actually occurred in the Schnabels' cases. See Mallozzi Aff. ¶¶ 13-14. Even if the court were to assume that Edward and Brian received such a mailing, the court's Ruling would be unchanged.

arbitration or additional terms to follow.

In this last screen, Trilegiant does mention an eventual email that Edward and Brian would receive, which it describes as a "welcome email." Id. However, nowhere does it mention that this email will include the terms and conditions of the agreement that was just entered into, nor does it suggest that reading the email is a necessary part of Great Fun membership.

Even assuming Edward and Brian read all of this information and entered their identifying information as alleged, the contract that they formed with Trilegiant did not include an arbitration clause. Instead, any contract that could have formed would have included terms exactly as Trilegiant proposed them in their prompts—a monthly charge in exchange for online savings. By agreeing to these terms, Edward and Brian did nothing to manifest their assent to any additional terms and conditions that might be unilaterally imposed by Trilegiant. See Specht, 306 F.3d at 29-30 ("[A] consumer's clicking on a download button does not communicate assent to contractual terms if the offer did not make clear to the consumer that clicking on the download button would signify assent to those terms.").

By the time Edward and Brian received an email from Trilegiant, any contract had already been formed. Both Edward and Brian claim to have never seen the email in question, but, assuming they had and assuming that they had understood it as an attempt by Trilegiant to bind them to the terms and conditions contained in the email, neither Edward nor Brian manifested assent to these terms at the time the contract was

formed.[5]  Trilegiant did not require them to accept the terms of the enclosed agreement in order to continue the contractual relationship.[6]  Instead, Trilegiant's language suggests that, simply by reading the proposed agreement, the plaintiffs were bound by it.  See Pls.' Opp., Ex. A.

Silence may, of course, constitute acceptance of an offer.  See Gentry v. Superior Court, 42 Cal. 4th 443, 468 (2007); John J. Brennan Constr. Corp. v. City of Shelton, 187 Conn. 695, 710 (1982).  The offeree must, however, "by his words or conduct, lead[] the offeror reasonably to interpret that silence as such."  John J. Brennan Constr., 187 Conn. at 695; see also Gentry, 42 Cal. 4th at 468 ("[S]ilence can constitute acceptance when 'the conduct of the party denying a contract has been such as to lead the other reasonably to believe that silence, without communication, would be sufficient.'" (quoting 1 Corbin on Contracts (rev. ed. 1993) § 3.21, p. 414)).  No reasonable jury would view the Schnabels' failure to cancel their subscription after having viewed this email (assuming they did) as a manifestation of assent to the email's terms.  Trilegiant had never before communicated by email with either Edward or Brian, and nothing within its prior interaction with the two men would suggest that this was an acceptable means of communicating binding terms and conditions.  See Lamb v. Emhart Corp., 47 F.3d 551 (2d Cir. 1995) ("[W]hen one party has the power to alter or amend the terms of the agreement, there must be an ascertainable standard for the

---

[5] While one of the screens allegedly viewed by Edward and Brian referenced an incoming "welcome email," see Defs.' Mem., Ex. A, nothing about this warning suggests the eventual receipt of additional terms and conditions.

[6] In fact, the email sent to Edward specifically instructs the reader not to reply to it.  Pls.' Opp., Ex. A.

9

promulgation of the new terms that is set forth in the original agreement . . . .").

This case is readily distinguishable from well-known "shrinkwrap" cases. In Hill v. Gateway 2000, Inc., for example, the Seventh Circuit upheld contract terms that were attached to a computer which was ordered by telephone. 105 F.3d 1147 (7th Cir. 1997); see also ProCD, Inc. v. Zeidenberg, 86 F.3d 1447 (7th Cir. 1996) (upholding contract terms contained in software box). "Transactions in which the exchange of money precedes the communication of detailed terms are common." ProCD, 86 F.3d at 1451. However, in these cases the "consumer, on one hand, has surrendered some consideration ex ante in anticipation of an exchange with notice that some terms will apply, and on the other hand has the opportunity, after being given the terms but not access to the desired product, to reject them and obtain a refund." Register.com, 356 F.3d at 429 n.39 (Parker, J., draft opinion).[7] In this case, Edward and Brian received no notice of the eventual receipt of additional terms and were never given the opportunity to "reject" the email they eventually received.[8]

---

[7] While Judge Parker's opinion did not command the majority in Register.com, his reasoning is pertinent to the facts in this case. The majority's decision focused on the consumer's awareness of the proposed terms before accepting the benefits to which the terms were attached. Register.com, 356 F.3d at 402 (majority opinion). Trilegiant does not contend that Edward or Brian had any advance notice of the terms, nor does it allege that, after receiving the email in question, the men accepted any additional benefit from the program.

[8] Trilegiant's approach in this case is all the more suspect in light of its decision to not use a clickwrap contract, requiring a consumer to affirmatively "accept" or "reject" terms and conditions. See Specht, 306 F.3d at 33-34 (collecting cases). Clickwrap contracts are ubiquitous and have been consistently upheld by courts. Id. While the Second Circuit clarified that assent need not always depend on the clicking of specific button, it noted that, "in many circumstances, such a statement . . . is essential to the formation of a contract." Register.com, 356 F.3d at 403 (majority opinion). Unlike the consumer in Register.com, there is no evidence of the Schnabels' awareness of the proposed terms and conditions prior to their decision to contract with Trilegiant. See id. ("It is standard contract doctrine that when a benefit is offered subject to stated conditions, and the offeree makes a decision to take the benefit with knowledge of the terms of the offer, the taking constitutes acceptance of the terms . . . ." (emphasis added).

The other cases cited by defendants are not helpful. In MBNA America Bank, N.A. v. Bailey, a Connecticut Superior Court compelled arbitration when the clause was not in the original agreement signed by the plaintiff. No. CV44001079S, 2005 WL 1754881 (Conn. Super. May 25, 2005). However, the court noted in that case that the language of the original agreement expressed the intent of making the separate, future terms and conditions a part of the contract. Id. at *3. This is an unremarkable decision, and certainly not supportive of defendants in this case. The Supreme Court of Connecticut has long held that, where the parties "'execute a contract which refers to another instrument in such a manner as to establish that they intended to make the terms and conditions of that other instrument a part of their understanding, the two may be interpreted together as the agreement of the parties.'" Allstate Life Ins. Co. v. BFA Ltd. P'ship, 287 Conn. 307, 315 (2008) (quoting E&F Constr. Co. v. Rissil Constr. Assocs., Inc., 181 Conn. 317, 319 (1980)). Nowhere in Trilegiant's initial terms (as expressed in the screen shots provided to the court) did the company indicate that the Schnabels would be bound by a separate document. The simple reference to a "welcome email" is a far cry from the language necessary to indicate manifest agreement to the later email's terms and conditions.

The MBNA America Bank case is also distinguishable because the consumer in that case accepted a benefit under the contract after being informed of the proposed terms. 2005 WL 1754881, at *2. There is no evidence that Brian or Edward received any such benefit from Trilegiant after receiving their welcome emails. Neither man logged into his account, received coupons, or even cashed in on the rebate originally offered to him. Other cases cited by defendants are similarly distinguishable. See

11

Walters v. Chase Manhattan Bank, No. CV-07-0037, 2008 WL 3200739, at *3 (E.D. Wash. Aug. 6, 2008) (plaintiff continued to use credit card after notice of new terms); Kurz v. Chase Manhattan Bank, 319 F. Supp. 2d 457, 465 (S.D.N.Y. 2004) (same); see also Milligan v. Comcast Corp., No. 7:06-cv-0089, 2007 WL 4885492, at *2 (N.D. Ala. Jan. 22, 2007) (plaintiffs continued to use cable services after notice of new terms).

Much more similar to the present case is Memberworks, Inc. v. Yance, 899 So. 2d 940 (Ala. 2004). There, the Alabama Supreme Court upheld an agreement to arbitrate where a consumer, Yance, made an oral agreement by phone and later received terms and conditions in the mail. See id. at 941. The agent on the phone informed Yance that he would receive a "kit" in the mail, with little explanation of what would be contained in the kit. Id. While the court recognizes the similarity between the Yance case and the present one, the court is not persuaded by the Alabama Supreme Court's reasoning. As the dissent in Yance articulated, the majority's decision is in conflict with prior cases requiring there to be "mutual assent to the terms of a contract." Id. at 947 (Houston, J., dissenting). The Alabama cases that had previously permitted the unilateral addition of terms were ones which involved an ongoing contractual relationship and where the original contract provided notice of the possibility of future amendments. Id. at 948-49 (collecting cases). The court finds the dissent's approach in Yance to be persuasive and consistent with the Connecticut and California case law discussed, supra.

For these reasons, the court concludes that no agreement to arbitrate exists between Trilegiant and the Schnabels, even accepting the facts as Trilegiant alleges them. Therefore, Trilegient's Motion to Dismiss or Stay and Compel Arbitration is

12

denied, and the parties should proceed to discovery.

**IV.     CONCLUSION**

For the foregoing reasons, the court denies defendants' Motion to Dismiss or Stay and Compel Arbitration (Doc. No. 23).  The parties are instructed to comply with this court's prior instructions and file an amended Rule 26(f) Scheduling Plan within fourteen (14) days of this Ruling.  See Doc. No. 18.

 **SO ORDERED.**

Dated at Bridgeport, Connecticut this 24rd day of February, 2011.

>  /s/ Janet C. Hall
> Janet C. Hall
> United States District Judge